******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# JOHN B. *v.* COMMISSIONER OF CORRECTION*
## (AC 41640)

Lavine, Prescott and Harper, Js.

*Syllabus*

The petitioner, who had been convicted of, inter alia, the crimes of attempt to commit kidnapping in the first degree and attempt to commit sexual assault in the first degree, sought a writ of habeas corpus, claiming, inter alia, that under current case law interpreting the kidnapping statutes, including *State* v. *Salamon* (287 Conn. 509), his due process rights under the federal and state constitutions were violated due to the trial court's failure to properly instruct the jury. The petitioner's conviction stemmed from his conduct in bursting through the door of the victim's apartment, choking her and engaging in a physical struggle with her, after which he dragged her out of the apartment and into a nearby hallway. Eventually the struggle moved outdoors, where a bystander heard the victim's screams and restrained the petitioner until the police arrived. While at the police station, the petitioner admitted that he intended to bring the victim back to his apartment to rape and torture her. Although the trial court did not instruct the jury that in order to find the petitioner guilty of attempted kidnapping, it had to find that he intended to restrain the victim to a greater degree than was necessary to commit sexual assault, the habeas court concluded that the trial court was not required to give a *Salamon* instruction and that even if it had been required to do so, the absence of a *Salamon* instruction was completely harmless because there was no reasonable possibility that a jury instructed pursuant to *Salamon* would have reached a different result than it did. Accordingly, the habeas court rendered judgment denying the amended petition, and, thereafter, granted the petition for certification to appeal, and the petitioner appealed to this court. *Held:*

1. The petitioner's claim that the habeas court's failure to give the jury a *Salamon* instruction was not harmless error was unavailing, that court having properly concluded, on the basis of the evidence, that the petitioner was not entitled to a *Salamon* instruction because he intended to abduct and restrain the victim for a longer period of time and to a greater degree than would have been necessary to commit the other charged offenses and was only thwarted by the victim's own efforts to escape and the timely intercession of a third party: the evidence demonstrated that the petitioner intended to render the victim unconscious, bind her and take her to his apartment where he would rape and torture her, and that he engaged in conduct designed to carry out his plan when he burst into her apartment, choked her and chased her when she attempted to get away, and his attempt to bind and move the victim from her apartment to his apartment where he intended to rape and torture her increased the risk of harm, prevented her from seeking help and would have prevented the crime from being detected, which showed that he prevented the victim's liberation for a longer period of time or to a greater degree than that which would have been necessary to commit the other crime; moreover, the state was not required to establish any minimum period of confinement or degree of movement, the petitioner, who was convicted of attempt to commit kidnapping in the first degree, failed to address the law pertaining to the crime of attempt as it related to the facts of this case, and because the trial court was not required to give the jury a *Salamon* instruction, it was not necessary for this court to determine whether the absence of such an instruction was harmless error.

2. The petitioner's claim that his trial counsel was ineffective in conceding his guilt to a burglary charge during closing argument was unavailing; the habeas court properly determined that the petitioner failed to satisfy his burden of overcoming the presumption that trial counsel's remarks reflected a reasonable trial strategy, as the petitioner had pursued an affirmative defense that he should be found not guilty by reason of mental disease or defect, which entails an acknowledgment that he committed the offenses, counsel explained to him that such an affirma-

tive defense constituted an admission of guilt, and although the petitioner was equivocal as to whether he recalled counsel's advice to him about presenting a mental disease or defect defense involving a concession of guilt and claimed that he misunderstood that he would have to concede his factual guilt to all charges, there was no evidence in the record that the petitioner ever objected to counsel's concession strategy and the habeas court made no such finding, and counsel's presentation of that defense was predicated on the evidence in the record, including testimony from two experts that the petitioner was suffering from a mental disease or defect when he committed the charged crimes.

Argued September 17—officially released December 17, 2019

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Kwak, J.*; judgment denying the petition, from which the petitioner, on the granting of certification, appealed to this court. *Affirmed.*

*James E. Mortimer*, assigned counsel, for the appellant (petitioner).

*Timothy F. Costello*, assistant state's attorney, with whom, on the brief, were *Brian W. Preleski*, state's attorney, and *Tamara Grosso*, assistant state's attorney, for the appellee (respondent).

*Opinion*

LAVINE, J. The petitioner, John B., appeals from the judgment of the habeas court denying his petition for a writ of habeas corpus. On appeal, the petitioner claims that the habeas court erred when it concluded that (1) the trial court's failure to charge the jury pursuant to *Salamon*[1] was harmless beyond a reasonable doubt and (2) trial counsel did not render ineffective assistance of counsel. We affirm the judgment of the habeas court.

The following procedural history is relevant to the petitioner's claims. The petitioner is in the custody of the respondent, the Commissioner of Correction, serving consecutive sentences totaling fifty-five years that were imposed by the trial court following two jury trials. On January 28, 2005, the petitioner was sentenced to fifteen years in prison after a jury found him guilty of assault in the second degree in violation of General Statutes § 53a-60 (a) (2) and assault of a peace officer in violation of General Statutes § 53a-167c (a) (1) (assault case). The petitioner's conviction was upheld on direct appeal.

On December 5, 2005, the petitioner was sentenced to forty years in prison after a jury found him guilty of attempt to commit sexual assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-70 (a) (1), attempt to commit kidnapping in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-92 (a) (2) (A), burglary in the first degree in violation of General Statutes § 53a-101 (a) (2), assault in the third degree in violation of General Statutes § 53a-61 (a) (1), and interfering with an officer in violation of General Statutes § 53a-167a (a). *State* v. *John B.*, 102 Conn. App. 453, 455, 925 A.2d 1235, cert. denied, 284 Conn. 906, 931 A.2d 267 (2007) (attempted kidnapping case).[2] The petitioner's conviction was upheld on direct appeal. Id.[3]

Following the petitioner's convictions, our Supreme Court rendered a decision in *State* v. *Salamon*, 287 Conn. 509, 949 A.2d 1092 (2008), which changed Connecticut law regarding kidnapping in conjunction with another crime. Thereafter, in *Luurtsema* v. *Commissioner of Correction*, 299 Conn. 740, 12 A.3d 817 (2011), our Supreme Court held that *Salamon* applied retroactively to collateral attacks on judgments rendered final before *Salamon* was issued. Those two cases are at the heart of the petitioner's *Salamon* or due process claims in this appeal.

On September 11, 2014, the self-represented petitioner initiated the present habeas corpus action. Appointed counsel filed a second amended petition on August 21, 2017, alleging that (1) the petitioner's due process rights under the fifth, sixth, eighth and fourteenth amendments to the federal constitution and article first, § 8, of the constitution of Connecticut were

violated by the trial court when it failed to charge the jury pursuant to *State* v. *Salamon*, supra, 287 Conn. 509, and (2) his trial counsel rendered ineffective assistance. The respondent denied the material allegations of the amended petition, and the matter was tried on October 11, 2017. The habeas court denied the petition for a writ of habeas corpus on March 23, 2018, and, thereafter, granted the petitioner certification to appeal.

In its memorandum of decision, the habeas court quoted the facts reasonably found by the jury as stated in this court's opinion in the petitioner's direct appeal in the attempted kidnapping case. See *State* v. *John B.*, supra, 102 Conn. App. 455–48. "[T]he [petitioner] and the female victim were neighbors in an apartment building. The [petitioner] and the victim were acquaintances; they had never spoken to each other on the telephone, but the [petitioner] had once been to the victim's apartment, visiting with her and her granddaughter. At approximately 9:30 p.m. on May 8, 2001, the [petitioner] called the victim on the telephone and invited her to his apartment to watch a movie with him. The victim declined the invitation, but the [petitioner], in a stern voice, insisted that she come to his apartment. After this initial conversation ended, the [petitioner] called the victim again, but the victim did not answer her telephone.

"A short time later, the [petitioner] appeared at the victim's apartment, knocking on the door and windows. The [petitioner] identified himself and asked the victim to let him into her apartment. The victim became frightened. As she approached the door to her apartment, the [petitioner] burst through the door, wrapped his hands around her throat and began to choke her. A physical struggle between the [petitioner] and the victim ensued. While the victim tried to break free and to protect herself, the [petitioner] dragged her out of her apartment and into a nearby hallway. The [petitioner] told the victim to 'go with it' and to 'let go.' In a hushed voice, the [petitioner] also told the victim that he loved her. At one point during the struggle, the victim pretended to faint, causing the [petitioner] to loosen his grip on her neck. The victim began to flee, but the [petitioner] grabbed her by one of her legs and pulled her back to him. Eventually, the struggle moved outdoors where the victim, experiencing difficulty as a result of the [petitioner's] assault, began screaming for help. The [petitioner] caught up with her and pinned her against a wall.

"A bystander, Myron St. Pierre, heard the victim's cries for help and observed the [petitioner] attempting to pull the victim against her will back inside the apartment building. St. Pierre approached the [petitioner] and the victim, instructing them to break up the melee. The [petitioner] told St. Pierre: '[S]he just got out of a mental institute. She's crazy. We can handle it . . . it's

all right.' The victim told St. Pierre that the [petitioner] was lying and was trying to kill her. The victim also asked him to call the police. After the [petitioner] briefly chased the victim and St. Pierre, St. Pierre physically restrained the [petitioner] on the ground and instructed the victim to run to a nearby police station. The victim took refuge in her apartment and reported the incident to the police. St. Pierre restrained the [petitioner] until the police arrived on the scene.

"When David Posadas, an officer with the local police department arrived at the scene, St. Pierre informed him that the [petitioner] had attacked the victim. Posadas asked the [petitioner] what had occurred, and the [petitioner] replied that he had not attacked the victim. The [petitioner] stated that the victim was suicidal and that he had tried to prevent her from harming herself. Posadas also spoke with the victim, who appeared to be upset and disheveled. The victim related the [petitioner's] actions to Posadas; her account was corroborated in part by the caller identification function on her telephone, which reflected that the [petitioner] had called the victim earlier that evening.

"The [petitioner] was placed under arrest. A search of his person incident to his arrest yielded, among other items, a pair of handcuffs and a 'bondage device.' The [petitioner] consented to a police search of his apartment. Although the [petitioner] was calm and cooperative with the police until and immediately following his arrest, he began mumbling to himself and rocking back and forth during the search of his apartment. During the booking process at the police department, the [petitioner] became combative with the police officers involved; he would not comply with the orders being given to him by the officers and refused to be fingerprinted. . . .

"At approximately 3 a.m. on the morning following his arrest, the [petitioner] indicated that he wanted to discuss the events that culminated in his arrest. After waiving his right to remain silent, the [petitioner] spoke with Sandra Mattucci, an officer with the local police department. The [petitioner] stated that, on the prior evening, he had intended to help the victim by bringing her 'into a deeper level of consciousness and . . . into a true reality.' He stated that he intended to accomplish this by using the handcuffs and [the] bondage device found on his person and by raping and torturing the victim. The [petitioner] admitted that he entered the victim's apartment and choked the victim to 'make her unconscious so that he could bring her back upstairs to his apartment . . . [and] bring her into this true reality.' He also stated that he previously had used the handcuffs and [the] bondage device on himself and others." Additional facts will be included as necessary.

Before addressing the petitioner's claims, we set forth the standard of review. "Historical facts constitute a

recital of external events and the credibility of their narrators. . . . Accordingly, [t]he habeas judge, as the trier of facts, is the sole arbiter of credibility of witnesses and the weight to be given to their testimony. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review." (Citations omitted; internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 677, 51 A.3d 948 (2012).

I

The petitioner's first claim on appeal is that the habeas court improperly denied his petition because the trial court's failure to give a jury instruction pursuant to *Salamon* was not harmless beyond a reasonable doubt. We disagree.

We begin with the standard of review applicable to the petitioner's claim. In reviewing the petitioner's *Salamon* claim, we are mindful that mixed questions of law and fact are subject to plenary review. See *Hinds* v. *Commissioner of Correction*, 321 Conn. 56, 65, 135 A.3d 596 (2016). "The applicability of *Salamon* and whether the trial court's failure to give a *Salamon* instruction was harmless error are issues of law over which our review is plenary." *Farmer* v. *Commissioner of Correction*, 165 Conn. App. 455, 459, 139 A.3d 767, cert. denied, 323 Conn. 905, 150 A.3d 685 (2016).

The habeas court determined that the petitioner had alleged that (1) the trial court did not properly instruct the jury with respect to the charge of attempted kidnapping, (2) he was convicted for conduct that the legislature did not intend to criminalize with regard to attempted kidnapping, (3) plea negotiations were unreasonably curtailed in light of the change in the interpretation of the kidnapping statute, (4) he is being unreasonably and cruelly punished for conduct that is, in light of *Salamon*, no longer a crime in Connecticut, and (5) the due process violations prejudiced his case and limited his ability to obtain a lesser sentence or a conviction of a lesser offense.

The habeas court's memorandum of decision discloses that it was cognizant of the controlling law. "[A] defendant may be convicted of both kidnapping and another substantive crime if, at any time prior to, during or after the commission of that other crime, the victim is moved or confined in a way that has independent criminal significance, that is, the victim was restrained to an extent exceeding that which was necessary to accomplish or complete the other crime. Whether the movement or confinement of the victim is merely incidental to and necessary for another crime will depend on the particular facts and circumstances of each case." (Footnote omitted.) *State* v. *Salamon*, supra, 287 Conn. 547. "[W]hen the evidence reasonably supports a finding

that the restraint was *not* merely incidental to the commission of some other, separate crime, the ultimate factual determination must be made by the jury." (Emphasis in original.) Id., 547–48. "Connecticut courts ultimately assess the importance of a *Salamon* instruction by scrutinizing how a reasonable jury would perceive the [petitioner's] restraint of the victim, particularly with respect to when, where, and how the [petitioner] confined or moved the victim." *Wilcox* v. *Commissioner of Correction*, 162 Conn. App. 730, 745, 129 A.3d 796 (2016).

Our Supreme Court summarized the circumstances preceding and following its decision in *Salamon* in *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 66. "Under our Penal Code, the hallmark of a kidnapping is an abduction, a term that is defined by incorporating and building upon the definition of restraint. . . . In 1977, this court squarely rejected a claim that, when the abduction and restraint of a victim are merely incidental to some other offense, such as sexual assault, that conduct cannot form the basis of a guilty verdict on a charge of kidnapping. . . . The court pointed to the fact that our legislature had declined to merge the offense of kidnapping with sexual assault or with any other felony, as well as its clearly manifested intent in the kidnapping statutes not to impose any time requirement for the restraint or any distance requirement for the asportation." (Citations omitted; footnote omitted.) Id., 66–67. The court left "open the possibility that there could be a factual situation in which the asportation or restraint was so miniscule that a conviction of kidnapping would constitute an absurd and unconscionable result that would render the statute unconstitutionally vague as applied." Id., 67–68.

In *Salamon*, the court reexamined the broad, literal interpretation of the statute. Id., 68. "In concluding that it must overrule its long-standing interpretation, the court went beyond the language of the kidnapping statute to consider sources that it previously had overlooked." Id. The court explained that "[o]ur legislature, in replacing a single, broadly worded kidnapping provision with a graduated scheme that distinguishes kidnappings from unlawful restraints *by the presence of an intent to prevent a victim's liberation*, intended to exclude from the scope of the more serious crime of kidnapping and its accompanying severe penalties those confinements or movements of a victim that are *merely incidental to and necessary for* the commission of another crime against that victim. Stated otherwise, to commit kidnapping in conjunction with another crime, a [petitioner] must *intend* to prevent the victim's liberation for a longer period of time or to a greater degree than that which is necessary to commit the other crime." (Emphasis in original; internal quotation marks omitted.) Id., 69.

Thereafter, Peter Luurtsema filed a petition for a writ of habeas corpus seeking to have the *Salamon* holding applied retroactively to his case.[4] See *Luurtsema* v. *Commissioner of Correction*, supra, 299 Conn. 764. In Luurtsema's habeas appeal, our Supreme Court "concluded as a matter of state common law that policy considerations weighed in favor of retroactive application of *Salamon* to collateral attacks on judgments rendered final before that decision was issued." *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 69.

In the present case, the habeas court found that the petitioner's jury trial in the attempted kidnapping case occurred in 2005, three years before the Supreme Court rendered its *Salamon* decision. The trial court, therefore, did *not* give the jury a *Salamon* instruction. The habeas court assumed for the purposes of its analysis of the petitioner's claim that he was entitled to a *Salamon* instruction.[5] The court conducted its analysis pursuant to the following test: "[T]he test for determining whether a constitutional [impropriety] is harmless . . . is whether it appears beyond a reasonable doubt that the [impropriety] complained of did not contribute to the verdict obtained." (Internal quotation marks omitted). *State* v. *Hampton*, 293 Conn. 435, 463, 988 A.2d 167 (2009), quoting *Neder* v. *United States*, 527 U.S. 1, 15, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999). "The test for determining whether a trial court's constitutionally defective jury charge was harmless . . . is not whether a jury likely would return a guilty verdict if properly instructed; rather, the test is whether there is a reasonable possibility that a properly instructed jury would reach a different result." *State* v. *Flores*, 301 Conn. 77, 87, 17 A.3d 1025 (2011).

The habeas court continued that the petitioner was charged in part with attempted kidnapping[6] and that the trial court instructed the jury that the petitioner was alleged to have taken "a substantial step forward in abducting another person . . . by substantially and unlawfully restraining [the complainant's] movement and restrained [her] by the use of physical force with the intent to inflict physical injury upon her." (Internal quotation marks omitted.) The habeas court determined that the facts reasonably found by the jury included the petitioner's bursting through the door of the victim's apartment, wrapping his hands around her throat and choking her. The petitioner struggled with the victim, who tried to break free of him, but he dragged her outside the apartment into a nearby hallway. When the victim began to flee, the petitioner grabbed her leg and pulled her back toward him. The victim and the petitioner continued to struggle and ended up outdoors, where the victim screamed for help. The petitioner pinned her against a wall. The day after he committed the offenses, the petitioner acknowledged to the police that he intended to torture and rape the victim.

In assessing the petitioner's *Salamon* analysis in his posttrial brief, the habeas court found a critical flaw emanating from the brief's compression of the timeline and the absence of relevant facts. The habeas court found that the petitioner's overly succinct summary of the facts pertaining to the sequence of events omits much of what transpired between the petitioner and the victim.[7] The petitioner's analysis of his *Salamon/Luurtsema* claim omits facts reasonably found by the jury. The habeas court found that as a result of the petitioner's "myopic view" of the facts surrounding the protracted series of incidents that the petitioner contends that his restriction of the victim was merely incidental to the attempted sexual assault.

The habeas court continued by comparing the *Luurtsema* facts with the facts of the present case. In *Luurtsema*, a case in which the defendant was convicted of attempt to commit sexual assault in the first degree and kidnapping in the first degree,[8] the facts surrounding the kidnapping involved the defendant's having moved the victim from the couch to the floor in front of the couch. Any sexual assault could have occurred on the couch or on the floor, or both, but whether the movement or restriction of movement had any distinct criminal significance was for a properly instructed jury to determine. The habeas court found that the present matter involved facts readily distinguishably from cases where a *Salamon* instruction clearly was warranted. It concluded that "[t]he trial court was not required to give a *Salamon* instruction, but even if it had been required to do so . . . the absence of a *Salamon* instruction was completely harmless because there [was] no reasonable possibility that a jury instructed pursuant to *Salamon* would have reached a different result than it did."[9]

In his appellate brief, the petitioner claims that the habeas court erred in concluding that a *Salamon* instruction was not warranted by the facts of the case. He claims that the brief, continuous, and uninterrupted struggle between him and the victim that began at or about the threshold of her apartment and progressed to the exterior of the building lasted mere minutes.[10] He continues that "the additional offenses for which [he] was charged were so inextricably intertwined with the struggle that occurred within such a short timeframe, a *Salamon* instruction was warranted." The sum and substance of the petitioner's claim is that because the time between his entering the victim's apartment and the arrival of the police was mere minutes—five to ten—any restraint he imposed on the victim was incidental to the underlying crimes. He contends that the habeas court incorrectly characterized the struggle between him and victim as a "protracted series of incidents" and that there is no evidence to support the habeas court's characterization of events. The essence

of the petitioner's claim is that because his struggle with the victim took place in a short period of time and the distance she was moved was insignificant, the trial court's failure to give a *Salamon* instruction was not harmless as the habeas court had concluded. In analyzing the *Salamon* factors, the petitioner contends that he restrained the victim for mere minutes, the victim was not exposed to an increased risk of harm beyond the charged offenses, and the victim was able to escape and summon assistance. We reject the petitioner's attempt to minimize the significance of his conduct.

The petitioner's reliance on the length of time he restrained the victim and the distance he moved her is misplaced and rests on a misapplication of *Salamon*. Our Supreme Court has stated that "to establish a kidnapping, the state is not required to establish any minimum period of confinement or degree of movement." (Footnote omitted.) *State* v. *Salamon*, supra, 287 Conn. 546. Moreover, the petitioner was convicted of *attempt* to commit kidnapping in the first degree, not kidnapping in the first degree. The petitioner failed to address our law regarding the crime of attempt as it pertains to the present case in his brief.[11]

Significantly, the state highlights the fact that the petitioner was charged with *attempt* to commit kidnapping in the first degree, not kidnapping in the first degree. The state notes that the trial court instructed the jury that "the state does not claim that the defendant actually committed the crime of kidnapping first degree. Rather, it claims that the defendant is guilty of attempting to commit that crime." The trial court continued, "[w]ith respect to the first count, our criminal attempt statute insofar as it applies here provides as follows: a person is guilty of an attempt to commit a crime if acting with the kind of mental state required for commission of a crime, in this count kidnapping first degree, he intentionally does anything which under the circumstances as he believes them to be is an act constituting a substantial step in a course of conduct planned to end in his commission of the crime."[12]

The state points to evidence of the indisputably bizarre and disturbing statements the petitioner made to Mattuci that he intended to help the victim by bringing her into a deeper level of consciousness and true reality by using handcuffs and bondage and raping and torturing her, which the prosecutor argued to the jury. The police found handcuffs and a bondage tool on the petitioner's person when he was arrested. During the state's final argument, the prosecutor argued the facts related to the petitioner's intent to render the victim unconscious, bind her, and abduct her from her apartment to his where he intended to rape and torture her. On the basis of the evidence, the state concludes that the habeas court properly determined that the petitioner was not entitled to a *Salamon* instruction

because he intended to abduct and restrain the victim for a longer period of time and to a greater degree than would have been necessary to commit the other charged offenses and was only thwarted by the victim's own efforts to escape and the timely intercession of a third party. We agree with the state.

The salutary effect of the *Salamon* rule is to prevent "the prosecution of a defendant on a kidnapping charge in order to expose him to the heavier penalty thereby made available, [when] the period of abduction was brief, the criminal enterprise in its entirety appeared as no more than an offense of robbery or rape, and there was lacking a genuine kidnapping flavor." (Internal quotation marks omitted.) *State* v. *Salamon*, supra, 287 Conn. 546. *Salamon* does not require an instruction if the restraint or transport of a victim progresses significantly above and beyond the conduct intended and required to commit other charged or uncharged crimes. Id. The evidence in the present case demonstrated that the petitioner intended to render the victim unconscious, bind her and take her to his apartment where he would rape and torture her. The evidence of the petitioner's conduct from the time he burst through the door of the victim's apartment until St. Pierre came to her assistance demonstrates the petitioner's attempt to carry out his intention to bind her, render her unconscious, take her to his apartment, and rape and torture her. Moreover, his conduct and restraint of the victim exceeded that which was necessary to commit the object of his criminal intent. He choked the victim; when she broke free and ran from the apartment he grabbed her leg and pulled her back, and when she was free again, he chased her and pinned her against a wall and kept St. Pierre from coming to her aid. In addition, the petitioner's attempt to bind and move the victim from her apartment to his where he intended to rape and torture her increased the risk of harm, would have prevented her from seeking help, and would have prevented the crime from being detected. Clearly, the petitioner attempted "to prevent the victim's liberation for a longer period of time or to a greater degree than that which [would have been] necessary to commit the other crime." (Footnote omitted.) Id., 542.

On the basis of our review of the record, we conclude that the trial court was not required to give the jury a *Salamon* instruction, and therefore, we need not decide whether the absence of the instruction was harmless error because it is not reasonably possible that a properly instructed jury would have reached a different result. See *State* v. *Flores*, supra, 301 Conn. 87.

## II

The petitioner's second claim is that the habeas court improperly concluded that his trial counsel did not render ineffective assistance of counsel by conceding the petitioner's guilt during closing argument.[13] We

disagree.

In his amended petition for a writ of habeas corpus, the petitioner alleged in part that his trial counsel's representation fell below the level of reasonable competence required of criminal defense lawyers in Connecticut and that, but for counsel's acts and omissions, it is reasonably probable that the outcome of the proceedings would have been different. More specifically, the petitioner alleged that counsel (1) failed to explain meaningfully to him the potential of continued prosecution in view of the missing victim,[14] (2) failed to explain meaningfully to him the maximum and minimum penalties of the charges against him, (3) failed to engage effectively in plea negotiations, (4) failed to move to stay the imposition of the sentence in the assault case, (5) failed to request that the petitioner receive all available jail credit due him at the time of sentencing in either case, (6) improperly conceded the petitioner's guilt in closing argument in the kidnapping case without his consent, (7) failed to present any mitigating evidence at sentencing, and (8) failed to consult with the petitioner about the consequences of changing his plea during final argument. The habeas court concluded that the petitioner failed to prove that his trial counsel rendered ineffective assistance pursuant to the allegations in (1), (2), (6), (7), and (8).[15] On appeal, the petitioner claims only that the habeas court improperly determined that trial counsel did not provide ineffective assistance when counsel conceded the petitioner's guilt during final argument without his consent.

The following procedural history and facts are relevant to the petitioner's claim of ineffective assistance of counsel. At his criminal trial in the attempted kidnapping case, the petitioner asserted the affirmative defense of mental disease or defect pursuant to General Statutes § 53a-13.[16] In support of the affirmative defense, at trial, counsel presented testimony from Andrew W. Meisler, a psychologist, and Kenneth M. Selig, a forensic psychiatrist, both of whom had examined the petitioner.[17] Meisler testified that the petitioner suffered from "chronic, longstanding, very severe mental illness," which had exhibited itself since the petitioner was a child. Meisler also testified that the petitioner's records contained diagnoses including schizophrenia, bipolar disorder, and "psychiatric disorders that people have a hard time identifying."[18] Meisler opined that the petitioner's conduct on the night of the attempted kidnapping, as described by the victim and as observed by the police, was consistent with the petitioner's history of mental illness. He further opined that due to the petitioner's mental illness, the petitioner "lack[ed] the substantial capacity at times to conform his behavior to the expectations of the law and of society."

Selig testified that the petitioner had a "serious men-

tal disorder" of psychotic proportions. On the basis of his review of the petitioner's psychiatric records and his own examination of him, Selig concluded that the petitioner suffered from "some form of personality disorder . . . that renders him so vulnerable to stress that he'll lose touch with reality." Selig opined that the petitioner's conduct, as revealed in the police reports and related by the petitioner himself, was consistent with his mental illness.[19]

In his closing argument, defense counsel argued to the jury, in part, as follows: "You will hear from [the judge] that what the defense raised in this case is called an affirmative defense of mental disease, and the reason why it's an affirmative defense is because there's a burden placed on the defendant to prove to you that he was suffering from a mental disease at the time of the incident and that as a result of that mental disease he didn't appreciate or substantially appreciate the wrongfulness of his act or did not substantially appreciate adjusting his conduct according to the law. . . . [W]hen an affirmative defense is raised . . . the defense has to prove by a preponderance of the evidence.

"[As the judge] goes through what's called the jury charge . . . look . . . carefully because you will be asking yourself whether or not you come up with what was the facts this case or not, and I'm not going to stand here and say nothing happened to [the victim]. You would have to decide whether or not what happened to [the victim] . . . justified charging my client with kidnapping, burglary, attempt to commit sexual assault, attempted kidnaping, assault, and interfering with a police officer, but the judge will instruct you if you find [the petitioner] guilty of any one of [the charges] so then the next thing you'll have to decide is did the defense prove their defense of mental disease. . . . [W]hat we're claiming is the facts and the testimony prove upon a preponderance of the evidence that [the petitioner] did not substantially understand the wrongfulness of his actions or he did not substantially adjust his conduct to the law. . . .

"It was the evidence that had two expert witnesses here testifying about the history of [the petitioner] up to the incident. . . . Selig brought you up almost to a week before and after. . . . Meisler talked about after, about [the petitioner's] mental disease and he was not in touch with reality.

"Now, an interesting part is assume the doctors weren't even here, assume we rested . . . and said take a look at the facts as they are and make your decision. So what do you have? And of course only your memory counts here, but my client is charged with attempted or attempt to commit sexual assault. Now if [the petitioner] had the intent to commit sexual assault why would he be dragging [the victim] outside of her apart-

ment into the street? That's one point you have to ask yourself.

"It's a horrendous thing that happened to [the victim], but looking at it without sympathy, we'd have to analyze this. *As far as the burglary, obviously, he pushed the door and went in. So there's burglary there.* As far as attempted kidnapping, nobody knows what he supposedly—well, you heard the testimony of [the victim]. He dragged her out into the street and who knows what he wanted to do. Go to a movie or what? He wasn't saying anything. He wasn't say[ing] get in my car. He didn't have anything on him, no dangerous weapon or anything. . . .

"So I tell you, even without the expert witnesses that we had . . . the uncontroverted testimony of the expert witnesses, looking at it as to what he did, I'm not trying to mitigate it. I'm just trying to show you or have you think about what he did do. What did he do? Did he act like a, was that a normal person?" (Emphasis added.)

Attorney Robert McKay represented the petitioner in both the assault case and the attempted kidnapping case. The petitioner previously had been represented by Attorney Douglas Pelletier, who had collected the majority of discovery materials, including reports from Meisler and Selig. McKay testified at the habeas trial that when he entered the cases, he advised the petitioner that he was not likely to prevail, but the petitioner was unwilling to pursue a plea deal. As trial approached in the assault case, McKay tried to convince the petitioner to pursue a mental disease or defect defense in that case. The petitioner rejected his advice, and the jury found the petitioner guilty.

Before trial in the attempted kidnapping case, the petitioner decided to present the affirmative defense of mental disease or defect to those charges. McKay could not remember when he discussed with the petitioner that presenting a mental disease or defect defense would involve conceding in closing argument that the petitioner had engaged in the charged conduct. McKay asserted that he would have discussed the matter with the petitioner before trial and testified that "because of the first trial, and then having the argument with him about bringing that affirmative defense, it's my recollection that he clearly understood . . . that we would be saying, 'yes, I did it, but because of my mental illness . . . I wouldn't have been able to adjust my conduct to the law because of my mental illness.' I mean so we had clearly had that conversation for the first one." McKay could not recall if he advised the petitioner specifically that, by presenting a mental disease or defect defense, he automatically would be conceding his guilt, but McKay believed that it was made known to the petitioner that he would have to say, "yes, I did it." McKay's strategy for closing argument was to

use the petitioner's aberrant conduct to his benefit. At the habeas trial, McKay testified that "it was the entire incident that I was . . . probably conceding just to have . . . some sympathy from the jury toward my client, because it was so abnormal for a person who really didn't know his neighbor, to break into her apartment and drag her down the street and do all that."

At the habeas trial, the petitioner testified that it was a "psychotic break" in 2001 that lead to his arrest and subsequent incarceration. He also testified that he had decided not to present a mental disease or defect defense in the assault case because he believed that, even if he was convicted without the defense, he would have received a sentence of only time served, but if he were found not guilty by reason of mental disease or defect, he could have been hospitalized for up to fifteen years. Contrary to his expectation, the petitioner was found guilty and sentenced to fifteen years of incarceration. Thereafter, the petitioner chose to present a mental disease or defect defense in the attempted kidnapping case.[20] The petitioner testified that counsel informed him that by pursuing a not guilty plea by reason of mental disease or defect defense the petitioner was conceding guilt but he did not think that he had to say that he was guilty for everything.[21]

After the parties submitted their posttrial briefs, the habeas court issued its memorandum of decision. The habeas court addressed the five claims of ineffective assistance of counsel that the petitioner had not abandoned; see footnote 15 of this opinion; and determined that counsel had not rendered ineffective assistance. With respect to the only claim raised by the petitioner on appeal, i.e., counsel improperly conceded the petitioner's guilt as to the burglary charge during closing argument, the habeas court stated that an affirmative defense asserted, pursuant to § 53a-13, that the petitioner should not be found guilty by reason of mental disease or defect inherently entails an acknowledgement that he committed the offenses. The object of such a defense is to have the defendant found not criminally liable for unlawful conduct. See, e.g., *Connelly* v. *Commissioner of Correction*, 258 Conn. 374, 387, 780 A.2d 890 (2001). "[B]y maintaining an affirmative defense pursuant to § 53a-13, the petitioner admitted his commission of the crime. . . . Such an admission necessarily implies that the petitioner also concedes that each of the individual elements comprising the offense is satisfied . . . ." (Citation omitted; internal quotation marks omitted.) *Sastrom* v. *Mullaney*, 286 Conn. 655, 663–64, 945 A.2d 442 (2008). The habeas court failed to see how the closing argument of the petitioner's counsel in which he acknowledged the petitioner's actions is indicative of deficient performance. The court concluded that counsel's remarks reflect a reasonable trial strategy and, thus, that the petitioner failed to demonstrate that counsel's performance was inef-

fective.

At the outset, we set forth the applicable standard of review. "The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review." (Citation omitted.) *Duperry* v. *Solnit*, 261 Conn. 309, 335, 803 A.2d 287 (2002).

"It is axiomatic that the right to counsel is the right to the effective assistance of counsel. . . . A claim of ineffective assistance of counsel consists of two components: a performance prong and a prejudice prong. To satisfy the performance prong, a claimant must demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the [s]ixth [a]mendment. . . . Put another way, the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . In assessing the attorney's performance, we indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . The claim will succeed only if both prongs are satisfied." (Citations omitted; internal quotation marks omitted.) *Sastrom* v. *Mullaney*, supra, 286 Conn. 662.

Pursuant to our plenary review of the petitioner's claim, we conclude that the habeas court properly determined that counsel's performance with respect to his closing argument in which he conceded the petitioner's guilt with respect to burglary was not deficient. The petitioner bears the burden "to prove that his counsel's performance was objectively unreasonable." *Eubanks* v. *Commissioner of Correction*, 329 Conn. 584, 598, 188 A.3d 702 (2018).

The evidence demonstrates that counsel urged the petitioner to assert a mental disease or defect special defense in the assault case, but the petitioner rejected counsel's advice. Following his conviction in the assault case, the petitioner informed his counsel that he wanted to pursue a mental disease or defect affirmative defense in the attempted kidnapping case. Counsel explained to the petitioner that such an affirmative defense constituted an admission of guilt. Counsel testified that he advised the petitioner prior to trial that asserting a not guilty plea by reason of mental disease or defect affirmative defense involved a concession of guilt.[22] The petitioner was equivocal as to whether he recalled counsel's advice to him that presenting a mental disease or defect

defense involved a concession of his factual guilt. The petitioner claimed that he misunderstood that he would concede his factual guilt to all charges. See footnote 20 of this opinion. There is no evidence in the record, however, that the petitioner ever objected to counsel's concession strategy and the habeas court made no such finding. Moreover, counsel's closing argument was predicated on the evidence in the record. Meisel and Selig both testified that the petitioner was suffering from a mental disease or defect when he committed the charged crimes. Conceding something that is obviously so is not ineffective advocacy. Counsel's closing argument conceding guilt was a reasonable trial strategy to further the petitioner's interest of pleading not guilty by reason of mental disease or defect. The petitioner's claim, therefore, fails.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statues § 54-86e.

[1] *State* v. *Salamon*, 287 Conn. 509, 949 A.2d 1092 (2008).

[2] The charges in the assault case arose out of an incident that took place in the holding area of the Bristol courthouse while the petitioner was awaiting arraignment on the charges in the attempted kidnapping case. *State* v. *John Bosse*, supra, 99 Conn. App. 675. We have omitted a discussion of the facts in the assault case as they are not implicated in the present appeal.

[3] The petitioner filed an application for sentence review with respect to both convictions. He asked the sentence review division to reduce his sentence by ordering that his fifteen year sentence in the assault case and his forty year sentence in the attempted kidnapping case run concurrently, rather than consecutively, for a total effective sentence of forty years. He claimed, pursuant to Practice Book § 43-28, that his fifty-five year sentence was inappropriate and disproportionate because he had no criminal record prior to his convictions in those cases. He also claimed that neither of the victims was seriously injured. The sentence review division determined that the petitioner's sentences fell within the parameters of Practice Book § 43-28.

[4] Previously, in *State* v. *Luurtsema*, 262 Conn. 179, 203–204, 811 A.2d 223 (2002), our Supreme Court "foreclosed the possibility of an absurd or unconscionable result as a matter of statutory interpretation." *Hinds* v. *Commissioner of Correction*, supra, 321 Conn. 68.

[5] In footnote 2 of its memorandum of decision, the habeas court also stated that the facts in the attempted kidnapping case did not, in the court's analysis, warrant a *Salamon* instruction.

[6] The state alleged in part in count two of the operative information that the petitioner "with the requisite mental state required for the commission of kidnapping in the first degree did take a substantial step forward in abducting another person specifically the [victim] . . . by substantially and unlawfully confining her movement and restrained [the victim] by the use of physical force with the intent to inflict physical injury upon her."

[7] Our review of the petitioner's posttrial brief supports the habeas court's assessment of the petitioner's *Salamon* analysis. The relevant portion of the petitioner's brief states only the following facts: "Witness Marcia Wynne testified at the criminal trial that she heard someone screaming, called the police from her garage phone, and police arrived within three to five minutes of her call. . . . St. Pierre . . . testified that he was sitting on a porch where his friend lived when he heard a woman screaming. [He] testified that he broke up the physical struggle and restrained the petitioner while they waited for the police. [He] stated that the police arrived within five to seven minutes of the encounter. Officer Posada testified that he responded to a dispatch call around 10 p.m. to 10:30 p.m. on May 8, 2001. [The victim] testified that she received a phone call from the petitioner around 10:30 p.m. on May 8, 2001, and that soon after, the struggle with the petitioner ensued. This testimony, paired with . . . Posadas' testimony demonstrates that the events occurred close in time." The victim "testified that the struggle

took place at the door of her apartment building and a wall nearby." (Footnotes omitted.)

[8] See *Luurtsema* v. *Commissioner of Correction*, supra, 299 Conn. 743.

[9] The habeas court also determined that the petitioner's brief failed to analyze several allegations in count one of his petition, i.e., the petitioner was convicted for conduct that the legislature did not intend to criminalize with regard to the attempted kidnapping conviction; plea negotiations were unreasonably curtailed in light of the change in the interpretation of the kidnapping statute; and that he is being unreasonably and cruelly punished for conduct that is, in light of *Salamon*, no longer a crime in Connecticut. Moreover, the habeas court concluded that the petitioner presented no evidence to support the allegations, and the allegations were without merit and/or were abandoned.

[10] On appeal, the petitioner's description of the events was more inclusive than the description he included in his posttrial brief in the habeas court.

[11] General Statutes § 53a-49 (a) provides: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

General Statutes § 53a-92 (a) provides in relevant part: "A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually."

General Statutes § 53a-91 provides in relevant part: "The following definitions are applicable to this part:

"(1) 'Restrain' means to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent. . . .

"(2) 'Abduct' means to restrain a person with intent to prevent his liberation by either (A) secreting or holding him in a place where he is not likely to be found, or (B) using or threatening to use physical force or intimidation. . . ."

[12] During the state's final argument, the prosecutor reminded the jury of the petitioner's statement to the police that he went to the victim's apartment intending to rape and torture her through the use of handcuffs and bondage tools, objects that were found on his person at the time of his arrest.

[13] On appeal, the petitioner claims that his ineffective assistance of counsel claim is not governed by *Stickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), that requires a petitioner to prove by a preponderance of evidence that counsel's performance was so deficient that counsel was not functioning as counsel guaranteed by the constitution and that but for counsel's unprofessional performance there is a reasonable probability that the result of the proceedings would have been different. Rather, the petitioner contends that his claim is controlled by *McCoy* v. *Louisiana*, U.S. , 138 S. Ct. 1500, 200 L. Ed. 2d 821 (2018). In *McCoy*, the United States Supreme Court held that defense counsel overrode his client's sixth amendment right to autonomy by admitting the client's guilt without the defendant's consent. Violation of a client's autonomy constitutes structural error and is not subject to harmless error analysis. Id.; see also *Leon* v. *Commissioner of Correction*, 189 Conn. App. 512, 208 A.3d 296, cert. denied, 332 Conn. 909, 209 A.3d 1232 (2019).

The respondent contends that we should decline to review the petitioner's client autonomy or *McCoy* claim because the petitioner did not raise it in the habeas court, and the habeas court, therefore, did not rule on it. Thus, the record is inadequate for review. We agree. In *Leon*, this court held that a "petitioner's attempt to cast his claim as one of client autonomy, rather than ineffective assistance [as pleaded], is a new invention on appeal which should not be entertained." (Internal quotation marks omitted.) Id., 521. Because the petitioner did not plead client autonomy or analyze it in his posttrial brief in the habeas court, we decline to consider it on appeal. Moreover, we note that the habeas court issued its memorandum of decision on March 23, 2018; the United States Supreme Court issued its decision in *McCoy* on May 14, 2018. The petitioner, therefore, could not have raised it in the habeas court.

[14] Initially the state was unable to locate the victim. Shortly before trial, however, her whereabouts were discovered, and she testified.

[15] The habeas court found that the petitioner had failed to address the allegations in (3), (4), and (5) and, therefore, deemed the allegations abandoned.

[16] General Statutes § 53a-13 (a) provides: "In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law."

[17] On June 15, 2001, the trial court, *Wollenberg, J.*, found the petitioner incompetent to stand trial but that he "may be" restored to competency after treatment. See *State* v. *Jenkins*, 288 Conn. 610, 618–19, 954 A.2d 806 (2008) (person charged with criminal offense "who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future" [internal quotation marks omitted]). On July 18, 2003, the trial court, *Handy, J.*, found the petitioner competent to stand trial and understand the proceedings against him.

[18] On cross-examination, Meisler conceded that some mental health professionals who previously had evaluated the petitioner opined that he was malingering.

[19] Selig also testified that in April, 2001, shortly before the charged offenses, the petitioner had been hospitalized for a brief period for a psychotic disorder. The records indicated that the petitioner had smoked marijuana and "there was some question at that time as to how much of the problem was related to marijuana and how much was related to just a basic psychotic illness."

[20] The petitioner also asked his counsel to seek a plea deal on the charges in the attempted kidnapping case. The state was not willing to negotiate a plea deal at that time.

[21] The petitioner testified as follows on cross-examination by the respondent:

"Q: So [Attorney McKay] did not advise you that you would be conceding guilty by pursuing the defense of not guilty by reason of mental defect?

"A: He—he did, but I was going to say something as concerning something else but—

"Q: So you knew that by pursuing that defense, you would essentially be saying that you were guilty of each of the crimes that you were charged with?

"A: Well, that umm—I—I didn't think I needed—I had to say that I was guilty for everything because—I wasn't so . . . he conveyed that . . . that guilt would be conceded because of the [not guilty by reason of insanity] defense you're not saying that it—it didn't happen, you're saying it happened, but even—but there were things that didn't happen that—that [I] wish not to concede to."

[22] When counsel was asked whether he discussed conceding guilt with the petitioner, he responded: "I don't recall specifically when I would have discussed it with him, but probably even before the trial. I'd be discussing that with him as far as going forward on that defense. He—first time he didn't want to do it. The second time he wanted that defense, affirmative defense, so then I would have gone over everything with him."